Good morning. Mr. Babb? Yes, Your Honor. I was just calling you to the podium. Thank you. Your Honor, my name, of course, as you've said, J. Babb. I represent the plaintiff appellant, Wesley Hightower, who worked at the Savannah River site for a number of years, since about 1985, under various contractors, until about 2009, when the Savannah River Remediation, the defendant in this case, took over the contract, and he worked in a training-lead type position. Your Honor, we're here on appeal of a grant of summary judgment, particularly as to Mr. Hightower's claims of Title VII discrimination and Title VII retaliation. We believe these were in error and ask this court to overturn the claims and allow us an opportunity to proceed to trial. The district court judge essentially ruled on both of those claims that Mr. Hightower failed to present sufficient evidence of pretext under a McDonnell Douglas Title VII analysis, both for retaliation and discrimination. We believe that there's sufficient evidence in the record to establish pretext as to both, and that it was sufficient evidence that a reasonable jury could find. Is there evidence in the record that Savannah River knew that some of Mr. Hightower's subordinates had complained about his management style due to racial animus? Did Savannah River know about the underlying alleged racial animus? Okay, so I think I understand your question is what did they know about maybe the... What did the employer know versus employees? Well, certainly Mr. Hightower made the employer aware of the comment made by Mr. Becker regarding the Dancing with the Aiken Stars, the charity event where he danced with a white female. Of course, my client is an African American. He made them aware of that. He made his supervisors aware of that. He made Mr. Myers, who's the HR representative, kind of leading this up, aware of that. He had also called Human Resources at one point prior to ever meeting with Mr. Myers on December 20th and made them aware of those comments as well. The comments being, of course, that they saw his picture and that he had lost respect of his... and who he was dancing with and lost respect for his...of his team. And what's interesting is that... Who were the decision makers here? The decision makers were... Shedd and Lampley, right? I would say, actually, Shedd and Mr. Myers. Mr. Myers seems to be the man behind the curtain in most of this. Certainly in his deposition testimony, he tries to cast some of that off. Mr. Lampley was the direct supervisor of my client, but it's pretty apparent, at least we believe from the record, that he was being directed as to what direction to go by either Mr. Myers or Mr. Shedd's involvement. Mr. Shedd would have been the next person up after Mr. Lampley. Okay, so give me the chart. Who it is that you think is calling the shots? I believe, Your Honor, and we believe that Mr. Shedd, Paul Shedd, and that Mr. Myers... Okay, we have the plaintiff. Who's his direct supervisor? It's Mr. Lampley. Lampley. Okay, and who's Lampley's supervisor? That is Mr. Shedd. Okay, and where does Myers come into this? If he's not supervising the plaintiff, how can he be the one who's calling the shots about firing? Well, that's an excellent question, Your Honor, but one that I think the record shows whether he should have been in the organizational chart or not, he was. He was directing both Mr. Shedd and Mr. Lampley kind of what to do. In other words... He was overruling what they were saying? He was telling them what to do, and they were following it. So they were essentially acting more... Where is your best evidence of that in the record? Well, I believe both Mr. Lampley and Mr. Shedd talk about Mr. Myers drafting some of the documents. Mr. Myers... I'm sorry. Go ahead. Mr. Myers drafting the documents, telling them what to put in the documents, particularly the performance improvement plan, the development plan. It was Mr. Myers who took over the quote-unquote investigation. It was Mr. Myers who met and kind of took over the meeting with Mr. Myers and Mr. Lampley on the 20th. Myers, though, was the HR employee. Isn't that correct? He wasn't in the chain of command in terms of what happened to this employee. He was the HR employee who was dealing with aspects of this. Isn't that it? Your Honor... How does he become a decision-maker? He's higher up in the food chain in HR than just someone working in HR handling these. Actually, Ms. Curry and Ms. Elam's names who appear in the record were under Mr. Myers. Forgive me, I can't recall his exact title at this time, but it was a higher position up. But he didn't have authority to terminate anybody's employment as an HR employee, did he? I would argue that at least he had apparent authority based on his involvement and the actions he took. He wasn't just sitting in the meeting and kind of providing advice, as you might expect, from human resources and being a support role, making sure people are dotting their I's, crossing their T's. He very much took over. In fact, he told his employees, who my client had contacted prior to ever coming back from leave, not to investigate and don't leave a paper trail. I really just don't understand this argument. If you've ever worked in any large organization, there are people, for example, in large law firms. Associates write things, they advise on things, and the partner makes the call. And who is the decision maker? The partner. And I don't understand how this situation here is any different. I understand, Your Honor. And, you know, we've argued certainly Mr. Shedd still stayed involved in this matter. And, of course, Mr. Lampley was the boots on the ground, so to speak, who was involved in this. But I do believe that Mr. Meyer's involvement can't just be discounted as, oh, he's just an HR. Okay. Well, let's just take it one thing at a time, then. Let's just assume that Shedd and Lampley are the decision makers. So then you have to demonstrate that they are motivated by racial animus, right? Yes, Your Honor. And where is that evidence? Yeah, tying the Dancing with the Stars comment to what Lampley and Shedd did. Well, Lampley and Shedd both agreed that there was no prior issues. The November 14th issue, which happened a day before my client went out on leave, you know, is the first supposed incident. My client reported to them what happened with these individuals, including Mr. Becker's comments. Instead of, as one would think, some type of reprimanding action happened, they instead appeared to support those employees and take action against him and not investigate those comments, not look into those comments, and don't take any action on it, basically supporting the actions of these employees. And I think, Your Honor, too, from a retaliation standpoint, it becomes even a little more clear because of the timing, temporal proximity of his complaints of discrimination, both to his supervisors. Didn't Mr. Hightower continue his employment at the same salary and pay grade after all was said and done? He did, however. What is the adverse employment action? Well, the adverse employment action is that he was removed from his leadership position, taken out of that position, which then could, you know, of course, this was a higher level position, at least for him to be able to go up in, be able to be promoted. What do you mean go up in? Are you saying that he didn't have the same promotion opportunities? Where's the evidence in the record of that? Other than my client's testimony about that, I don't know that there's a document or policy that shows a clear chain of promotion from it, but it was a training. Certainly, Your Honor. There was training leads. He was basically supervising the other training leads in this consolidated position, and so now he's been moved back down to essentially a training lead type position and not supervising those. So it's a lower position in that sense and would certainly affect promotional opportunities. But I think more importantly is because of this position, he was requesting the increase in pay due to the job scope increase. This was a position that was three positions consolidated into one over multiple tank farms and other areas, projects and some other areas. Mr. Shedd, of course, wrote an email about that same consolidation, acknowledging that my client had shown a zealous performance in establishing management of the employees. Now, this was right before. This is the email that Mr. Shedd sent to payroll trying to justify, not payroll, but the pay department trying to justify the salary increase. That was then denied after all of this happened, which I think both ties into retaliation, but also shows that there was an adverse action in that he didn't have the pay increase that should have come with the job. Did your evidence that other people with that job had a higher pay? Evidence in this record? Well, this is a consolidated position. Right. It's certainly hard to establish. You have to do apples to apples. So another person with a consolidated position had a higher pay? Well, Mr. Glenn Bishop, who was moved into a higher position. The same higher position that your client had had? Into my client's former position. Uh-huh. When he was moved into a position, but moved up to a training lead position, he did not have to write his own job justification, which my client had to do. I'm asking the difference. Remember, we're going back to the employment action. So if the employment action is the adverse employment action he suffered, I thought you said it was promotion opportunities, and he didn't get this job increase. I mean, pay increase. So did other people that had that job be paid a higher amount? Well, there's no other consolidated position over the tank farms that I would say is equivalent. So the answer is no, you don't have that. I don't have that consolidated position. But we do have Mr. Bishop, who was given, because of his increased duties, was given a pay raise versus what my client was given. I don't understand that. It sounds like you do have it in Mr. Bishop. Well, I believe we do in Mr. Bishop, but it's not the same position. It's not the consolidated position, but it's a training lead position. It's Mr. Hector's former job. It is. Because he was a training lead over. You're saying the former job is sufficient evidence. I believe it is because the former job was a training lead position over the DWFP, which was a separate area, not part of these other areas, and Mr. Hightower took over training lead over these others. However, he wanted an increase and believed he was justified in getting an increase in pay because even though it's another training lead position, just like his old one, it was a position that was over a couple areas where it used to be three jobs, three training leads instead of one. So there is that difference. However, it's still a training lead position over DWFP versus a training lead over this consolidated position. It's a white male versus an African American, and the white male was given the increase, whereas Mr. Hightower was not. Okay, I still don't get what you're saying. So try me, just substitute in factors. In his old position, he was getting $10 an hour and he wanted to get $15 an hour, right? This is hypothetical. This other guy, what did he get paid? He got an increase in pay. I understand, but did he get the $10 an hour or the $15 an hour? He would have gotten the $10 an hour. Well, then he was getting the same. You're saying his job was less important. He got $10 an hour for a lesser job than Mr. Hightower had at. Is that what you're saying? There's a scale, Your Honor, so. I know, but we're just hypothesizing. I'm just trying to make it so that you don't have to go that it's some odd number. Do you not understand the question? Well, Your Honor. That's all right if you don't understand the question. Let me ask you a question, counsel. It seems to me that your whole case is based on the fact that you can impute to the decision-makers comments or actions of other employees. Do you agree that in order for us to accept your position, we have to impute to the decision-makers the comments of the HR people, the comments of the employee COLO, the other employees who made negative remarks, that we have to impute those to the decision-makers in order for you to prevail? Your Honor, I think you can. And if not, why not? Your Honor, I don't know that you have to go that far. I think certainly you could show that they ratified that conduct by taking action against him versus those individuals. What else is there? Leaving the imputation, if that's a word, issue aside, what else do you have other than asking us to impute the comments of others to the decision-makers? What other evidence? Certainly, Your Honor. We also have established that there's, of course, the different treatment between him and the Caucasian individuals, Mr. COLO, for example, who was treated, was given a corrective action only after my client complained, and well after the fact, and the corrective action was a write-up. He cursed out my client, stood up, approached him aggressively, and basically had to be escorted out of the room. And he got a slap on the wrist after the fact. The issue here was his ability to manage his people, wasn't it? Whether Mr. Hightower was an effective manager. So the actions that his superiors took vis-à-vis other employees really isn't relevant, is it, to whether Mr. Hightower was an effective manager? And it seems to me that you're just relying on things that are peripheral to really what the issue before us is. Well, Your Honor, I think that there's no evidence other than all of a sudden, there's suddenly been issues in the record on November 14th when Mr. Walls acted out in the manner that he did. Mr. Shedd certainly testified that he thought he was an excellent performer, that he did well, that he managed well. So all these issues suddenly appearing seems very suspect. And his managers who were over him, who'd been in that new position for a year, couldn't give any evidence prior to these events on November 14th. I think that certainly speaks to that. But it also... Have you answered the question? Your time has expired, so you can go into rebuttal. Unless you have an answer to the judge's question. Thank you, Your Honor. May it please the Court. Good morning. My name is George Reeves. I'm with the law firm of Fisher & Phillips in Columbia, South Carolina. And I'm here today on behalf of Savannah River Remediation. Mr. Hightower's current employer, I'd like to go ahead and clarify that. There was some discussion during the question and answer there regarding termination. Mr. Hightower is, in fact, still an employee to this day with Savannah River Remediation in the position that he was transferred into as a result of these incidents. With that being said, Mr. Hightower's appeal is based on two questions regarding pretext. One is the discrimination claim. One is the retaliation claim. I think that as your questions have already proven and as we've briefed out, this is really not a matter where there's evidence of racial discrimination, but instead it's a questioning of a personnel decision or personnel decisions, which Mr. Hightower clearly did not agree with. However, the court was correct in this case in finding that the evidence did not establish that there was any intentional discrimination or retaliatory animus. I'll pick up on the questions that you were posing to counsel regarding the pay increase to start because that will give us some factual context. Mr. Hightower came into this consolidated position that we were discussing as a result of consolidation at the site. As the functions of Savannah River Mediation continued on, there was less work. There had been reductions in force. And so more people were having to do more with less, so to speak. And that's what resulted in this consolidated position. Mr. Hightower was specifically selected for this position by Paul Shett. That was because Mr. Hightower had applied for a training manager position, did not get it, interviewed well. Mr. Shett approached him and thought that this would be a good opportunity for Mr. Hightower because Mr. Hightower had already had experience in other areas of the site. Mr. Hightower accepted that site, and Mr. Bishop, who we were discussing, then filled Mr. Hightower's former position. So then at some point following his movement into the consolidated position, Mr. Hightower approached his managers and said, I'm doing more work now. I would like to see if I could make some more money as a result. Well, at that time, it was still unclear as to what the extent of this consolidated position would be because it was a newly created position. So the response initially was, let's wait and see how your job duties pan out, and then we'll revisit this. Later on, he again approached about the increase. Mr. Shett asked him to outline what his new job duties were so that he could submit it to management and see if it could be approved. Ultimately, he did that. Mr. Shett did say, as counsel indicated, that there was some increase in his job duties. Compensation manager Kimberly Arlen, who's testified in this matter, said that she reviewed the information, reviewed the pay scale. I'm sorry, can we skip ahead to the performance improvement plan? Because both Mr. Lampley and Mr. Shett testified that Appellant was a good performer, even after his subordinates had complained about working with him. So to me, the performance improvement plan seems a little bit to come out of nowhere. How did that – can you give me the background on that? Certainly. So what led to this was a meeting that was on November 14, 2012, in which Mr. Hightower was addressing his team regarding some issues that had come up and evaluations that were conducted. During that meeting, Mr. Walls and Mr. Kolo – I'm sorry, I cannot pronounce Mr. Kolo's last name, so I'm referring to him as Kolo. Mr. Kolo and Mr. Walls became upset. Mr. Walls did – I don't know if necessarily threaten, but did curse and yell at Mr. Hightower, and Jeff Becker did escort him out of the room. Following that meeting, Mr. Hightower contacted his manager, Charles Lampley, and instructed – or told him about what happened. Mr. Hightower was scheduled to go out on leave the next day and asked Mr. Lampley if he and or Paul Shett could address the situation. Okay, so Mr. Lampley goes – or Mr. Hightower goes out on leave. Mr. Lampley and Mr. Shett meet with Mr. Hightower's team. During that meeting regarding the November 14 incident, other members of his team began explaining issues that they had with Mr. Hightower's management style. One individual who has testified in this matter, Carol Sanderson, testified how she had broken down into tears regarding his management style, calling it a toxic environment. Others said that they felt like he spoke down to them as if they were children. He was constantly shifting priorities and causing stress on the group. Now – And there was no talk of racial animus during those meetings? There was never at any point during any of the events that are subject to this matter was there a discussion of any racial events. Yeah, the dance. Correct, and there's no mention of race here. There is an inference that it has to do with race. Yeah, but I think it's best when you're addressing the court's questions about any racial thing that you don't – you say there's nothing, and then upon questioning, yes, there is an inference. No. You know, so – I apologize. I wasn't clear on that, Judge Moss. Well, maybe I wasn't understanding what you meant. What I mean is there is no evidence that there was ever any mention of race. What was – You're saying no mention of race by whom? By anyone. It's certainly this dancing with the stars thing. I mean, you know, you have to live in the real world, and you know what they were talking about. I mean, isn't it a reasonable inference they were talking about the fact that this black man was dancing with the white woman? Well, we have to look at what the comments that Mr. Becker made were, I think, to answer your question. Be sure to do that. But is your answer to the judge's question yes or no? Yes, you do think it's a reasonable inference. I do not. Okay. I do not believe there's a reasonable inference because the comment that was made was you've lost credibility with the group. There's nothing about that that necessarily – You're less credible because you were dancing? It could be that he was – because he was dancing. It could be. We're asking you a reasonable inference. There's a reasonable inference that it was because he was performing in this. One reasonable inference. Or there's one inference. And so if – Correct me if I'm wrong, but aren't these dancing with the stars that communities do for fundraising? They pick very highly respected people in the community for dance instruction, and that these people are all considered pretty reputable and everything else. It's not like they're on TV, you know, shagging for dollars for themselves or anything, that these are people who are devoting their time to charity. Isn't that correct? So why would it be a reasonable inference that because he was participating in a Well, that could be – I agree that my understanding is that this is a charitable event, and that's why Mr. Hightower was participating. And these go on in cities all over the country to raise money for charity. That's my understanding as well. It can be – and because we're saying – Why is it a reasonable inference that participating in this charity fundraiser caused him to lose credibility? How does that become a reasonable inference? And it just – I believe, and because you're asking the question of what other reasonable inference could be, it could be that this is also an environment that maybe it's – I won't say crude, but it's not exactly maybe the most polite one among men. Individuals out there who are all former Navy nuke folks and everything, and working in this kind of environment maybe is just more of a scene of, you know, they look down at the dancing. Homophobia, real men don't dance. I don't know if I'd go that far. We don't know that this is joking. Frying pan into the fire. No, that's definitely not what I intend to do. But what I'm saying is just we don't know because there was no comment about the race made. And other than – Well, you keep saying that, and we keep saying, but this is an implicit comment about the race. If we – and even if we assume that to be true. That's the argument we're looking for. Okay, if we assume that to be true, and I apologize that I haven't gotten there in a more direct path. If we assume that to be true, it was made by Mr. Becker, who was not a decision maker. In fact, he was a subordinate of Mr. Hightower. There's no evidence to support any kind of cat's paw theory here that Mr. Becker had substantial influence over Mr. Lampley, Mr. Shedd, Mr. Myers, anyone involved in any of these decisions. Were any of the supervisors present at this meeting? No, Your Honor, there were not. And so it was not only an isolated comment. So we have to – yes, we have to if we infer that it had to do with race because of the race of his dance partner. But we cannot then impute that into the decision making here because there's no evidence that anyone else knew of it. I believe the testimony of Mr. Shedd and Mr. Lampley were that they may have even known that he was participating in this Dancing with the Stars thing. Opposing counsel, I thought I heard him say that Mr. Hightower had brought it to supervisors' attention. Brought it to their attention after the fact, Your Honor. And that is when – Well, how could he bring that to attention before the fact? I'm sorry, I wasn't clear on what the after the fact was. It was after the meeting, after he had learned that there was going to be a meeting with him and Mr. Lampley and Mr. Myers. So if we look at the timeline, again, the meeting where everything happened was on November 14th. Mr. Lampley then participated in that dance on November 15th, went out on leave on November 16th, if I remember correctly, and was out on leave into December. During that time is when Mr. Shedd, Mr. Lampley conducted their investigation, found out about the complaints while Mr. Lampley was out on – Mr. Hightower really had no opportunity to participate in the investigation and to let the supervisors know of this comment because it was all done while he was out on leave. At his request, Your Honor, yes, that's correct. It was done while he was out on leave. And then Mr. Lampley contacted Mr. Hightower, I believe on November 19th, while he was on leave to check on him, let him know that they had met with their group and that they would discuss it when he returned because he was on leave. They did not discuss anything with him. There were a couple of different people in this case who have testified that when Mr. Hightower would contact him, they would just simply say, when you get back from leave, we'll discuss that. And, indeed, that was the policy of Savannah River Remediation, was to not discuss these matters with someone who's out on medical leave. So upon learning that Mr. Hightower was going to meet with Mr. Lampley and Mr. Myers when he returned to work, that is when he reached out to Human Resources and the EEO office, and that is when he first made the mention of the Dancing with the Stars comment Mr. Becker made. And that would have been, I believe, if my timeline was correct, around December 20th before he came back. And that was to the EEO office? Yes, to the EEO office. Stephanie Franklin is the head of the EEO office. Stephanie Franklin also conducted an independent investigation, reached the same conclusion that Mr. Lampley and Mr. Shedd reached about the group because she also interviewed individuals in that team and there were complaints about his management style. And so it was then when he returned that he discussed these issues with Mr. Myers, who was in Human Resources, and Mr. Lampley, who was his direct supervisor. Initially, there was an agreement that he would apologize to the group and take some steps to try to mend the relationship. After, I guess, further consideration, he then told Mr. Lampley that he was not going to agree to the talking points and everything that Mr. Myers and Mr. Lampley had put together for him because he didn't necessarily agree with them. It was at that point when he indicated that he was not going to agree, although he had previously stated that he was going to, that what was first titled a performance improvement plan was drawn up by Mr. Myers. It was later revised because Mr. Hightower did take issue with the term performance. And again, with understanding of what that term performance may be, as the testimony has indicated, Mr. Hightower was not a poor performer in the sense of doing his job. It's just that they were faced with an issue of some of his subordinates feeling that his management style was detrimental to the group or at least causing them stress. So you're saying then that it's the perception of the decision-maker that counts. And in this case, the decision-makers had decided that he had trouble getting along with people. That is absolutely correct, Judge Geen. And that that does not constitute an actionable complaint discrimination. I mean, is that pretty much what your case is? I'm not sure if I would say that it's not an actionable complaint. I would say that if we're looking at it under the framework that we have to analyze a Title VII action. It's not evidence of pretext. Yes, ma'am. That's correct. Because the case law is fairly well established that it is the perception of the decision-maker at the time of the action that is relevant. Mr. Hightower, of course, has tried to rebut that with testimony from some other individuals who he had supervised in the past who said that they did not have a problem with him. That may be. In fact, the investigation that Ms. Franklin did and the investigation that Mr. Shedd and Mr. Lampley did also indicated that there were some employees who did not raise a concern. However, what the Savannah River Remediation Management was trying to address was the fact that there were some individuals who did have a problem with his management style. What they asked him to do was to commit to certain tasks, such as a 360-degree feedback, reading a book once a quarter or something on leadership skills, and other things like that to address the team. As far as the retaliation goes, because we haven't really discussed that yet, the evidence in this case undermines any thought that there would be retaliation. Mr. Lampley and Mr. Shedd had met with Mr. Hightower's group after the complaints had come before Mr. Hightower's return to work and indicated to the team that Mr. Hightower was returning as their training lead and that they were going to work through all of the issues that were raised. The document that was presented to Mr. Hightower, be it called a performance improvement plan or a development plan, both indicated that it was necessary for him to agree to these items that they were asking him to agree to in order to return to his lead position. So the evidence establishes that it was Mr. Lampley, Mr. Shedd, Mr. Myers' intent that Mr. Hightower would, in fact, return to his original role, but Mr. Hightower chose not to agree to those terms and signed the document in a manner which was not sufficient to management. And as a result, he was transferred to a position in the same job grade, same job ladder, only the difference was he was no longer supervising individuals. He was in the same training technical ladder, as I said, pay grade. He never lost any pay. He reports to the same individuals in this position that he is in right now as he did before. Is there evidence about promotion availability? There has been. There's no evidence in the record, but he's also, I believe, admitted that he never applied for any other positions during that time. And so to kind of feed on that and to my initial point, because there were a lot of questions about pay initially, the compensation manager reviewed the pay for all of the training leads at the time Mr. Hightower made his request and determined that Mr. Hightower was the highest paid individual in that pay grade and Mr. Bishop was the lowest paid, and I believe substantially so, which warranted that they actually had to bump him up. He never went to management, as Mr. Hightower did, and asked for a raise. He never said my job duties haven't increased or anything. It was upon a review of the compensation of all these individuals that they learned, according to the testimony of Ms. Kimberly Arland, that Mr. Bishop was, in fact, should have been higher paid than he was. But to my understanding, still now, Mr. Hightower remains the highest paid individual in his position. So assuming you have no further questions, we would just ask that the lower court's decision be affirmed. Thank you very much. Mr. Babb, do you have any rebuttal? Yes, Your Honor, thank you. I think it's important to note the retaliation claim, and certainly we talked a lot about the discrimination claim earlier, but I think the retaliation claim is very important in this case. Mr. Hightower reported what he felt about the inappropriate comment by Mr. Becker with the Dancing with the Stars and the treatment he received from Mr. Walls to his supervisor. He reported that to Ms. Elam and Ms. Curry in Human Resources, who were subsequently told to don't investigate and don't leave a paper trail by Mr. Myers, and that he had talked to Mr. Lampley about this. Then when he met with Mr. Lampley and Mr. Myers on the 20th of December, when he returned to work, that morning he had already emailed EEO, the internal EEO office, and already filed a complaint with them. He meets with Mr. Myers and Mr. Lampley, and even in that conversation, again, explained to them about the conduct and about the comment. Now, he certainly agreed in that conversation that he would apologize. He didn't agree with what was being said, but he certainly would apologize in his way and try to put things at ease. The performance improvement plan, the development plan, that all came after he filed, well after he filed the EEO, and after he filed both the internal EEO and the external, because there's also the U.S. Department of Energy has an EEO office, or Office of Civil Rights, with the EEO intake there on site that he also filed with. And all that occurred after he had met with them and filed those complaints with them. It's acknowledged by Mr. Myers that he filed with the EEO office. Mr. Myers had testified in his testimony, being asked, so what happened after the meeting with Mr. Hightower, and I'm referring to page 887 of the record, and he said, my recollection is that Wes left. He seemed reasonably okay with information at some point. He left. And then the next thing I believe I know is that we received the charge. We got an email saying an employee filed a charge for whatever reason, and that's the charge, and then he says, I won't. Let me back up. I don't want to use the word charge. A complaint, a request for an internal look. With who? Stephanie. With the internal EEO office? Yes, correct. That's my recollection. So Mr. Myers certainly felt like maybe he was done in that point in time, according to his testimony, after he met with Mr. Hightower on the 20th. Then he got the EEO notification, and certainly things changed. Mr. Hightower was told and testified that during that meeting it was made abundantly clear there wasn't a performance issue. Suddenly he's presented with a document claiming that there's a performance issue and a history or a pattern, excuse me, of inappropriate behavior, of which, of course, we oppose and say there isn't a pattern. If anything, there's a pattern of him doing a good job. He's been there since 1985. Some of the past performance that we've looked at isn't just to say, okay, well, since he performed well in the past, he must have performed well now. It's to try to show that these were not honestly held feelings by management, that they needed to have a performance improvement plan, a development plan. In other words, going to the pretext analysis that the reason given was not honestly held. So he, of course, objected to the performance improvement plan, and that was then changed to a development plan, but basically saying the same things. And both the performance improvement plan and development plan came after, but close in time to his complaints to EEO offices. I think that was very important for retaliation analysis, and I don't want retaliation claim to get lost in the discussion of discrimination claims. I wanted to make sure that I addressed those points. Thank you very much.
judges: Diana Gribbon Motz, Barbara Milano Keenan, Stephanie D. Thacker